UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

AE MANAGEMENT LLC., a Florida
limited liability company; AE
RESTAURANT GROUP, INC., a
Florida corporation; AE RESTAURANT               CASE NO:
ENTERPRISES, LLC, a Florida limited
liability company; ITALICA
RISTORANTE, INC., a Florida
corporation; ADL RESTAURANT, LLC,
a Florida limited liability company;
ANGELOS WINE BAR WESTON, LLC,
a Florida limited liability company; AE
ADDISON PLACE, LLC, a Florida
limited liability company; AE CORAL
SPRINGS, LLC, a Florida limited liability
company; AE OAKLAND BAKERY
AND TRATTORIA, LLC, a Florida
limited liability company; AE AVENTURA,
LLC, a Florida limited liability company;

     Plaintiffs,
v.

ILLINOIS UNION INSURANCE
COMPANY, an Illinois corporation;
CHUBB NATIONAL INSURANCE
COMPANY, an Indiana corporation;

     Defendants.
_____/

**COMPLAINT**

     Plaintiffs AE Management, LLC; AE Restaurant Group, Inc.; AE Restaurant Enterprises, LLC; Italica Ristorante, Inc.; ADL Restaurant, LLC; Angelos Wine Bar Weston, LLC; AE Addison Place, LLC; AE Coral Springs, LLC; AE Oakland Bakery and Trattoria, LLC; and AE Aventura, LLC ("Plaintiffs") sue Defendants Illinois Union Insurance Company ("Illinois

Union") and Chubb National Insurance Company ("Chubb") (collectively, "Defendants") and state:

## JURISDICTION, PARTIES AND VENUE

1. This is a civil action for breach of contract, costs, and attorneys' fees in excess of Fifteen Thousand Dollars ($15,000.00).

2. Plaintiff AE Management, LLC is a Florida limited liability company and operator of eight restaurants located in Broward County, Palm Beach County, and Miami-Dade County, as well as an office located at 3741 N. Federal Highway, Suite 302, Oakland Park, FL 33306.

3. Plaintiff AE Restaurant Group, Inc. is a Florida corporation and owner and/or operator of the restaurants described in the following paragraphs.

4. Plaintiff AE Restaurant Enterprises, LLC is a Florida limited liability company and operator of Angelo Elia Pizza Bar Tapas, a restaurant located at 4215 N Federal Hwy, Fort Lauderdale, FL 33308.

5. Plaintiff Italica Ristorante, Inc. is a Florida corporation and operator of Casa D'Angelo Ristorante, a restaurant located at 1201 N Federal Hwy, Fort Lauderdale, FL 33304.

6. Plaintiff ADL Restaurant, LLC is a Florida limited liability company and operator of Casa D'Angelo Ristorante, a restaurant located at 171 E Palmetto Park Rd, Boca Raton, FL 33432.

7. Plaintiff Angelos Wine Bar Weston, LLC is a Florida limited liability company and operator of Angelo Elia Pizza Bar Tapas, a restaurant located at 1370 Weston Rd, Weston, FL 33326.

8. Plaintiff AE Addison Place, LLC is a Florida limited liability company and operator of Angelo Elia Pizza Bar Tapas, a restaurant located at 16950 Jog Rd, Delray Beach, FL 33446.

9. Plaintiff AE Coral Springs, LLC is a Florida limited liability company and operator of Angelo Elia Pizza Bar Tapas, a restaurant located at 5920 Coral Ridge Drive, Coral Springs, FL 33076.

10. Plaintiff AE Oakland Bakery and Trattoria, LLC is a Florida limited liability company and operator of Angelo Elia The Bakery Bar, a restaurant located at 2104 E. Oakland Park Blvd., Fort Lauderdale, FL 33306.

11. Plaintiff AE Aventura, LLC is a Florida limited liability company and operator of Casa D'Angelo Aventura, a restaurant located at 2906 NW 207 St., Suite 103, Aventura, FL 33180.

12. Defendant Illinois Union Insurance Company, part of the Chubb Group of Companies, is an Illinois corporation with its principal place of business in Pennsylvania. Illinois Union is authorized to conduct business in Florida and issued the insurance policy at issue in this litigation.

13. Defendant Chubb National Insurance Company is an Indiana corporation with its principal place of business in New Jersey. Chubb, one of the world's largest property and casualty insurers, is authorized to conduct business in Florida and has several duties under the insurance policy, including (but not limited to) answering insured questions regarding coverage, receiving loss notices, investigating and assessing claims, issuing declination of coverage letters (when applicable), and receiving process served on Illinois Union's designated agent in Florida.

Upon information and belief, Chubb also compensates the broker and/or independent agent that procured the policy at issue.

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Diversity exists between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

15. Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial part of the property that is the subject of the action is situated in this District.

16. All conditions precedent to this action have occurred, been performed or have been waived.

## FACTS

**I. Introduction**

17. This case is about whether Plaintiffs' insurance policy provides coverage for the damages sustained and/or expenses incurred by Plaintiffs as a result of unprecedented emergency orders by state and local officials restricting Plaintiffs' on-premises business activities. A numbered copy of the policy is attached hereto as Exhibit "A."[1]

18. Plaintiffs, like other people and businesses, bought insurance to help when disaster occurs.

19. During such times, individuals and businesses (including Plaintiffs) are at their most vulnerable and desperate, a fact of which insurance companies (including Defendants) are keenly aware.

---

[1] The Table of Contents, 'Exhibit' footer and page numbers were added by Plaintiffs' counsel for the convenience of the Court.

20. Essentially, insurance companies promise, warrant and sell "peace of mind" that in the unlikely event of a catastrophe or disaster the policyholder will be fully and promptly indemnified.

21. The contract of insurance carries with it a duty of utmost good faith on the part of the insurer because of the vulnerability of policyholders during and following a disaster.

22. This duty includes Defendants' obligation to fairly and quickly adjust Plaintiffs' insurance claims, determining coverage and amount of loss, and providing prompt payment.

23. Here no such good faith investigation or adjustment occurred because Defendants reached a pre-determined conclusion to deny coverage.

24. Indeed, Defendants have apparently adopted a 'company line' to deny all business interruption claims similar to Plaintiffs', despite different circumstances, different executive orders, and differences in policies that can make or break coverage. As is laid bare on Defendants' website:

> **What types of events trigger business interruption coverage?**
> The vast majority of business interruption policies require **direct physical loss or damage to property**, such as, a fire or flood that damages the property and prevents the business from operating while repairs are being made. Each policy describes the events that trigger business interruption coverage.
>
> **What if my business is interrupted by government social distancing orders?**
> If businesses are closed by government actions, the policies still require direct physical loss or damage to the property or adjacent properties. With COVID-19, governments ordered shutdowns to keep people socially distant from each other, not because of dangerous property conditions.

Chubb, *Business Interruption Coverage: What You Need to Know*, https://www.chubb.com/us-en/businesses/campaign/business-interruption-coverage.aspx? (last accessed May 22, 2020) (emphasis in original).

25. This one-size-fits-all approach to policy interpretation and claims adjustment has led to the improper denial of countless business interruption claims, including Plaintiffs'.

5

26. For years and even decades, the vast majority of people and businesses, including Plaintiffs, that carry business interruption insurance have faithfully paid their premiums and have never made a claim. Now that there is a catastrophic business interruption caused by state and local emergency orders, their claims are summarily denied. Like Plaintiffs, many businesses are relying on their business interruption insurance to cover what it is supposed to cover – loss of income and ongoing expenses – to get through this crisis and rebuild their businesses.

27. Accordingly, Plaintiffs bring this suit in response to Defendants' refusal to honor their contractual obligations to pay Plaintiffs' covered loss and properly adjust Plaintiffs' claims.

## II. Plaintiffs' Business and Business Activities

28. Plaintiffs' business consists of a number of restaurants (from casual eateries to upscale Italian) in Miami-Dade, Broward, and Palm Beach Counties. Plaintiffs have been serving the Southern Florida community for over 22 years, racking up a number of awards, ranging from Zagat's America's Top Restaurants and Wine Spectator's Best of Award of Excellence on numerous occasions.

29. Plaintiffs not only own the buildings, but own and operate the businesses as well. To this end they engage in a number of business activities including, *inter alia*, the procurement, preparation, and sale of food and beverage items, the management and training of employees, marketing, accounting, and the maintenance of physical structures and equipment.

30. Plaintiffs' business activities also include various services they provide to their customers, including, *inter alia*, on-premises dining and table service, delivery service, and/or take-out service.

31. The vast majority of Plaintiffs' revenue derives from the on-premises dining and table service they provide, as the majority of their customers choose that service over their take-out and delivery services.

32. Thus, while grocers or retailers may provide a simple location for customers to purchase ready-to-eat food and beverages, Plaintiffs offer something more: a dining experience, which depends on the availability of the insured's property. This service is the essence of Plaintiffs' business and a primary reason their customers pay a premium.

33. Since the profits derived from this service are what determines their businesses' success or failure, insuring against the slowdown or cessation of this service due to unforeseen perils is of critical importance. This concept is nothing new, as 'business interruption insurance' has been around for hundreds of years.

### III. Background to Business Interruption Insurance

34. At its core, business interruption insurance (or 'business income' insurance as it is known today) ("BI") is meant to return an insured's business the amount of profit it would have earned had there been no interruption of business or suspension of operations. To better understand its context and role in Plaintiffs' overall Policy, some background information as to BI is helpful.

35. BI was developed in the United Kingdom in the early 19th century as a supplement to fire insurance, whereby insurers would compensate commercial building owners not only for the physical damage but for the insured's inability to utilize the building to collect rent (the primary business of the insured). The first 'loss of rent' coverage was offered by the English Hamburg Fire Office in 1817.

36. BI continued to evolve, and by the mid-19th century insurers in Europe began offering 'stoppage or cessation' insurance, that provided coverage for lost business income due to the inability to utilize property, typically a fixed percentage of what the company's stock on hand would have generated for the business during that time.

37. By the late 19th century, BI had come to the United States. In 1880, Boston-based insurer Dalton introduced 'Use and Occupancy' insurance, which insured the loss of production following a covered peril. Typically, the policy provided for a set dollar amount of recover for each day the insured was prevented from conducting operations. 'Use and Occupancy' continued to be the nomenclature adopted by American insurers up until the 1940s.

38. In the late 1930s, insurers began offering 'Gross Earnings' insurance. This was an iteration of BI which compensated insureds for the reduction in gross earnings due to a business interruption caused by a covered peril.

39. In 1986, the Insurance Services Office ("ISO") recommended replacing the 'Gross Earnings' policy form with the 'Business Income Coverage' form, which although modified is still frequently used today.

40. The emergence of coverage in certain policies, such as Plaintiffs', tied to the insured's interest in its income stream in many policies gave protection to business losses tied to a particular policy's language and covered causes of loss.

41. Though it has evolved over centuries, the crux of BI insurance has always been to return to insureds (such as Plaintiffs) the losses of business income resulting from the slowdown or cessation of their business.

**IV.     Plaintiffs Purchased Insurance for Their Business, Not Just Their Buildings**

42. In order to protect their property, businesses, *and* income from losses, Plaintiffs obtained an insurance policy (the "Policy") issued by Illinois Union.

43. At all relevant times, the Policy was in full effect as Plaintiffs paid the six-figure premiums due which Defendants accepted. Plaintiffs have been insured with Defendants for the last several years, paying the required premiums annually.

44. The premium Plaintiffs paid included coverages for, *inter alia*, buildings and personal property, business income and extra expense, and commercial liability. It also included additional coverage for 'extended' business income, civil authority, and a special 'restaurant enhancement endorsement' tailored to their type of business.

45. The Policy is an all-risk commercial policy meaning that it that provides coverage from all risks unless expressly excluded by language in the body of the policy or through a separate exclusion endorsement. There is no exclusion in Plaintiffs' Policy for lost business income caused by emergency orders restricting the services (i.e., business activities) they could provide at their properties.

## V. The Devastating Slowdown and/or Cessation of Plaintiffs' Business Activities

### A. The State and Local Emergency Orders

46. It is no secret that the world is in the midst of a pandemic. When it became apparent that the mere publicity around COVID-19 would not naturally facilitate voluntary strict social distancing and curtailing of social-gathering business operations (such as restaurants), state and local authorities intervened through a series of emergency orders.

47. For the most part (including those causing Plaintiffs' loss), the emergency orders were issued pursuant to an executive's emergency powers. They were not the result of the legislative or deliberative body's process typical of laws and regulations.

48. In Florida, Governor Ron DeSantis issued Executive Order 20-68 on March 16, 2020, mandating that restaurant dine-in services comply with a 6-foot distance between patron tables.

49. On March 17th, Miami-Dade County issued Emergency Order 03-20, ordering all restaurants with seating for more than eight persons to cease on-premises service of customers.

50. On March 20th, the Governor issued Executive Order 20-70, ordering all restaurants in Broward and Palm Beach counties to cease offering "on-premises service of customers" while allowing "delivery service, pick-up or take out services."

51. Plaintiffs complied with all applicable orders.

52. These and other unprecedented emergency orders were hardly a foregone conclusion or obvious consequence of the pandemic, as evidenced by the great variance between states and localities as to the types and extent of restrictions placed on businesses.

53. Not surprisingly, a nationwide debate has erupted as to the orders' necessity, appropriateness, breadth and length with some high-profile (to say the least) federal and state officials even questioning the motivation behind them.

54. In any event, the aforementioned emergency orders caused Plaintiffs' losses, as explained below.

**B.  Plaintiffs' Losses**

55. In response to the emergency orders, Plaintiffs were forced to slow down (and eventually cease) various business activities, most importantly the provision of on-premises dining and table service.

56. Beginning in March 2020, Plaintiffs were forced to severely restrict the services they could provide at their properties as a result of the emergency orders described herein.

57. Plaintiffs, to comply with the emergency orders, necessarily ceased a number of business activities on their premises; most importantly, the provision of on-premises dining services.

58. Beginning March 17 and continuing through May 11, Plaintiffs were not permitted to provide on-premises dining services, operating only with takeout and delivery services. After May 11, Plaintiffs operated only with limited capacity on-premises dining services. As a direct result of the emergency orders described herein, Plaintiffs have incurred a physical loss of (or alternatively, damage to) their properties for regular business operations.

59. Specifically, Plaintiffs lost the ability to provide specific services at their properties, were denied access to the properties to provide certain services, their customers were prevented from physically occupying the properties, causing the properties to be physically uninhabitable by customers, causing their function to be nearly eliminated or destroyed, and causing a suspension of business operations.

60. This loss of (or alternatively, damage to) their properties resulted in Plaintiffs' actual loss of business income and incurred extra expenses.

61. Absent the emergency orders, Plaintiffs' business income losses would have been minimal at most.

62. These losses and expenses have continued through the date of filing of this action.

63. Plaintiffs' actions were reasonable and necessary to comply with the various orders and mitigate the damages described herein.

**VI.   Relevant Policy Provisions Provide Coverage for Plaintiffs' Loss**

64. The losses incurred to Plaintiffs' business operations are covered under various policy provisions, as described in greater detail below.

### A. General Provisions

65. Plaintiffs purchased this commercial businessowners insurance policy, with policy number MCRD38181907, effective March 31, 2019 through March 31, 2020, insuring Plaintiffs' restaurants and office described in paragraphs 2-11, *supra*. Ex. A at 1, 13.

66. The Policy further provides coverage for 'newly acquired or constructed property,' which applies to Plaintiffs' property located at 2906 NE 207 St., Aventura, FL 33180 (a newly opened location for the Casa D'Angelo Ristorante). *Id.* at 36; *see also* Defendants' April 29, 2020 Declination of Coverage letter, attached hereto as Exhibit "B," at 1 (listing Aventura property).

67. The Policy is organized into three section: Common Policy Forms and Endorsements, Property Forms and Endorsements (which includes Business Income), and General Liability Forms and Endorsements. Ex. A at 14.

68. The Policy provides coverage for certain property, specifically physical buildings and personal property, and distinctly for business income.

69. With respect to the property forms and endorsements, the Policy has blanket limits of $7,879,226 for physical building and personal property damages and $15,704,226 for business income (i.e., business interruption losses). *Id.* at 83-89

70. The Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from *all risks* unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement. Ex. A at 31.

71. There is no exclusion in Plaintiffs' Policy for the loss of business income caused by emergency orders resulting in the physical loss of (or alternatively, damage to) Plaintiffs' properties.

### B. Business Income Coverage

72. Plaintiffs' business interruption coverage provides for loss of 'business income,' which is defined as "(a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (b) Continuing normal operating expenses incurred, including payroll." Ex. A at 46.

73. Due to a Restaurant Enhance Endorsement, 'business income' also includes "tip income of your employees (a) As reported to you by your employees; and (b) Reported by you to the Internal Revenue Service in accordance with Internal Revenue regulations." *Id.* at 75.

74. The Policy goes on to state:

> We will pay for the actual loss of Business Income you sustain due to the necessary *'suspension'* of your *'operations'* during the *'period of restoration'*. The *'suspension'* must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a *Covered Cause of Loss*.

*Id.* at 46.

75. When applying the Policy's definitions to the phrases italicized in the previous paragraph, the Policy is construed as follows:

> We will pay for the actual loss of Business Income you sustain [during the period of restoration] due to the necessary…slowdown or cessation…of your…business activities [at the covered locations]…caused by direct physical loss of or damage to property at [the covered locations]. The loss or damage must be caused by or result from a…Risk[] of Direct Physical Loss unless the loss is:

      1. Excluded in Section B [of the Causes of Loss-Special Form]; or

      2. Limited in Section C [of the Causes of Loss-Special Form].

*Id.* at 46, 47, 93.

76. As set forth above, in response to the emergency orders, which occurred during the policy term, Plaintiffs were forced to slow down (and eventually cease) various business activities, most importantly the provision of on-premises dining and table service.

77. Plaintiffs thus suffered the actual loss of Business Income during the policy term which were caused by the loss of (or alternatively, damage to) their property at the covered locations.

78. Plaintiffs' lost business income and is covered under the Policy and has not been excluded from coverage. Plaintiffs are entitled to payment for these business income losses.

    **C.**    **Extra Expense Coverage**

79. The Policy includes coverage for 'Extra Expense' which are "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." *Id.* at 46. Here, Plaintiffs incurred expenses relating to, *inter alia*, cleaning, sanitization, and personal protective equipment for its employees and staff.

**VII.**   **The Arbitrary Denial of Plaintiffs' Claim**

80. On April 16, 2020, Plaintiffs provided their first notice of their losses to Defendants and showed they had incurred business income losses during the policy term.

81. On April 29, 2020, Defendants denied the claim without any meaningful investigation of the facts or contractual terms. See Ex. B.

82. Defendants summarily claimed that the Plaintiffs' losses were caused by viral contamination, rather than the emergency orders, but provided no basis therefore. *Id.*

83. Nor did Defendants even bother to adjust potential losses under other potential coverages, such as those provided under the Restaurant Enhancement Endorsement (e.g., 'food contamination'). *Id.*

84. Defendant also made summary factual conclusions as to the inapplicability of civil authority coverage, but provided no basis for their factual conclusions. *Id.* at 2.

85. The losses Plaintiffs suffered are covered under the Policy, but Defendants have denied coverage despite Plaintiffs' timely notice of their claims.

86. Thus, Defendants are in breach of the Policy, by refusing to adjust under the various potentially applicable coverages, and refusing to adjust and promptly pay Plaintiffs' undisputed business income losses.

87. Defendants were obligated under the Policy to cover and pay these losses and other losses and expenses but have refused to do so.

## COUNT I

## **BREACH OF CONTRACT**

88. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

89. Plaintiffs have a commercial property insurance policy issued by the Defendants.

90. Plaintiffs have performed all their obligations as specified by the Policy including the payment of all premiums due.

91. Plaintiffs' Policy provides coverage for business income loss, extended business income loss, and/or extra expense.

92. As described in detail above, Plaintiffs suffered a direct physical 'loss of' (or alternatively, 'damage to') their property at the covered locations, which was caused by or resulted from the emergency orders described herein.

93. This direct physical 'loss of' (or alternatively, 'damage to') their property caused the necessary slowdown or cessation of Plaintiffs' business activities, resulting in an actual loss of business income.

94. The Policy also provides that the Defendants will pay for any necessary expenses that Plaintiffs incur that it would not have incurred had there been no physical loss or damage to their property.

95. Defendants are also in breach of the Policy by refusing to adjust potential losses under other potentially applicable coverages, such as those provided under the Restaurant Enhancement Endorsement and/or civil authority coverage.

96. As a result of the Defendants' repudiation or breach of the insurance policies, Plaintiffs have suffered actual damages.

**WHEREFORE**, Plaintiffs seek compensatory damages resulting from the Defendants' breach of contract, an appraisal to determine the amount of damages, and further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

(1) Awarding Plaintiffs compensatory damages from the Defendants' breach of the insurance policy in an amount to be determined at trial or appraisal ordered by this Court, together with appropriate prejudgment interest at the maximum rate allowable by law;

(2) Awarding Plaintiffs costs and disbursements and reasonable allowances for the fees of Plaintiffs' experts, and reimbursement of expenses;

(3) Awarding Plaintiffs attorneys' fees pursuant to Fla. Stat. § 627.428; and

(4) Awarding such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 15 day of July, 2020.

**KU & MUSSMAN, P.A.**

By: */s/ Brian T. Ku*
Brian T. Ku (Fla. # 610461)
Louis I. Mussman (Fla. # 597155)
18501 Pines Blvd., Suite 209-A
Pembroke Pines, FL 33029
Tel: (305) 891-1322
Fax: (954) 686-3976
brian@kumussman.com
louis@kumussman.com

*and*

Allan Kanner, Esq. (*pro hac vice* forthcoming)
Cynthia St. Amant, Esq. (*pro hac vice* forthcoming)
**KANNER & WHITELEY, LLC**
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777
Fax: (504) 524-5763
a.kanner@kanner-law.com
c.stamant@kanner-law.com
*Counsel for Plaintiffs*